THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUANITA J. DUNSWORTH, Defendant-Appellant.
Third District   No. 3—90—0644

Opinion filed August 19, 1992.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Samuel Naylor VI, State's Attorney, of Carthage (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

Juanita Dunsworth was convicted by a jury of involuntary manslaughter. Juanita was sentenced to three years' imprisonment. She remains free on bond pending this appeal.

Juanita raises two issues on appeal. She claims that her constitutional right to a fair trial was denied because: (1) the trial court submitted improper and confusing jury instructions; and (2) the prosecutor made improper and prejudicial comments during closing argument.

We reverse and remand for a new trial because we find the prosecutor made improper and prejudicial comments during closing argument which denied Juanita her constitutional right to a fair and impartial trial.

On September 1, 1989, Daniel Orville Dunsworth (Dan) died as a result of a single abdominal stab wound inflicted by his ex-wife, Juanita Dunsworth. On September 2, 1989, she was charged with two counts of first-degree murder. Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2).

The record shows that Dan and Juanita were married on Halloween, 1959, and divorced on June 5, 1984. Both had been previously married. Juanita was born on May 22, 1938, and is 5 feet 4 inches tall and weighs 110 pounds. She has been employed the past 14 years as a production worker at Sheller Globe, now Schlegel, in Keokuk, Iowa. Dan was age 53 and was employed at Griffin Wheel in Keokuk, Iowa. He stood 5 feet 11 inches tall and weighed 205 pounds.

At the time of his death, Dan lived with Barb Egley in a trailer home in Nauvoo. Barb had sold her trailer home in Hamilton and moved in with Dan two months before his death. At approximately the same time, Dan was making sexual overtures toward his ex-wife, Juanita. Dan and Juanita had maintained contact over the years following their divorce. They frequently socialized together and they talked regularly over the telephone. Juanita characterized their relationship by saying "they were just friends." She testified that there was nothing sexual about the relationship. However, Juanita did admit she was receptive to Dan's sexual advances which began during the summer of 1989. In fact, Juanita admitted she went to Dan's trailer home in July and voluntarily participated in sexual foreplay until they were interrupted by a neighbor's knock on the front door. Juanita admitted she would have consented to sexual intercourse with Dan at his trailer in July and also on September 1, 1989, the date of the stabbing.

Juanita and Dan had only one child from their prior marriage, Franz Dunsworth. On Labor Day weekend 1989, Dan and Franz planned to open a Hovercraft boat business to coincide with the beginning of the Nauvoo grape festival. Franz was now developing a closer relationship with his father. However, he still remained very close to

his mother. Franz had told Juanita about his father's relationship with Barb Egley, including the fact that Barb was living with Dan. Juanita, during the summer of 1989, had asked Dan about his relationship with Barb. Dan denied that Barb was living with him. However, Dan did admit that Barb had some clothes in his trailer and stayed there occasionally. Barb was unaware that Dan was making sexual advances toward Juanita as well as seeing her regularly during the summer of 1989.

Just a few days prior to Labor Day weekend 1989, Dan called Juanita and asked her if he could stop by her home on Friday morning. Juanita agreed. At 9:30 a.m. on Friday, September 1, Dan arrived at Juanita's home located at 1325 Cemetery Road, Warsaw, Illinois.

Shortly thereafter, they both went into her bedroom to have consensual sexual intercourse. Juanita testified that during foreplay, Dan forced her head toward his penis. Juanita said she did not want to perform oral sex. She also was upset with Dan because of his relationship with Barb. Rather than perform fellatio, she bit Dan's penis. Immediately thereafter, Dan either shoved or kicked Juanita off the bed and began screaming profanities at her. Juanita then retreated into the kitchen to phone Barb Egley. Juanita told Dan that she was going to tell Barb to come and get him and that Barb "could give him the blow jobs from now on." The record shows that at 10:08 a.m., Juanita dialed a number one digit different from Dan's. Juanita indicated she dialed the wrong number and no one answered. Dan followed Juanita into the kitchen and threatened to "tear her fucking head off." Dan grabbed the phone from Juanita as she redialed, and he then depressed the switch-hook. Dan simultaneously shoved Juanita backwards. She then picked up a 14-inch knife and held it in front of her. Juanita testified that Dan accidentally ran into the knife when he lunged at her. Dan then fell against the kitchen wall. Juanita denied ever thrusting the knife at Dan or intentionally stabbing him. Thereafter, Dan went into the bedroom, put on his pants, picked up his shirt and boots, and left Juanita's house. Dan left his glasses on her dresser. He fell and struck his head while leaving the home and collapsed in the front yard.

At 10:12 a.m., Juanita called the Warsaw emergency number for an ambulance. The call was received by Jan Blue, a dispatcher for the Hancock County sheriff's office. Juanita said, "This is Juanita Dunsworth and I just stabbed my ex-husband. Can you send somebody to Warsaw fast." She also told the dispatcher, "He came in here and

tried to have me, force me to have sex with him and I—. He is dying, please help me."

Verla Robinson, Juanita's neighbor, testified that she observed Juanita crying and acting hysterical while Dan was lying in the yard next to Juanita. Verla saw Juanita hold Dan's head on her lap and heard Juanita exclaim that she loved Dan. Verla also heard Dan repeatedly tell Juanita "don't call Barb." Verla testified Juanita told her that she had just stabbed Dan. Verla asked why. Juanita said that he wanted a blow job and she didn't have to do those things. Juanita exclaimed, "Let her do it."

Several emergency medical technicians (EMTs) were called by the defense to testify. They all corroborated Verla's observation that Juanita was very upset. Also, the EMTs testified that Juanita repeatedly said to them, "Please help him."

Juanita testified that she had acted in self-defense and never planned to kill Dan. Juanita said that she grabbed the knife for her own protection because she feared Dan was going to beat and injure her. She asserted that Dan was a violent and mean person. Juanita testified concerning many prior acts of violence where Dan previously had struck and injured both her and her children from another marriage.

Anita Howes, Juanita's daughter, corroborated the testimony concerning Dan's prior acts of violence. Also, many other family members and Juanita's children testified specifically regarding Dan's violent demeanor. Franz also corroborated the testimony and vividly recalled Dan's acts of violence against him. Additionally, Anita recalled repeated incidents of sexual abuse that were inflicted upon her by Dan. However, we note it was clearly explained to the jury that Juanita was unaware of the alleged sexual abuse when she stabbed Dan.

Hancock County Sheriff Dick Yager interviewed Juanita in her home immediately after Dan was taken to the hospital by the EMTs. The sheriff testified that the interview began at 10:28 a.m. Verla Robinson was also present with Juanita during the questioning. Shortly thereafter, Anita came to the home and was present for the last portion of the sheriff's interview. Juanita did not know during the questioning whether Dan was dead or alive.

Sheriff Yager testified that Juanita admitted she had bitten Dan's penis and stabbed him with a knife. The sheriff stated that during his 45-minute interview with Juanita, she never once indicated she had acted in self-defense. Also, Juanita told Sheriff Yager that all of her sexual activities with Dan were voluntary. The sheriff also recalled

that Juanita never claimed that Dan had forced her to have oral sex that morning. Furthermore, the sheriff testified Juanita admitted to him that she was mad as hell about Dan's relationship with Barb. Juanita told the sheriff that she felt Dan was just using her. She admitted to the sheriff that something suddenly just came over her which caused her to bite Dan's penis.

Gregory Gronewald, a Hancock County deputy sheriff, was present during much of Sheriff Yager's interview with Juanita. Gronewald's testimony corroborated the sheriff's version of Juanita's admissions.

Dr. Richard Watson performed the autopsy on Dan. His autopsy revealed that there were superficial bite marks on Dan's penis. Dr. Watson determined that Dan had died from a single stab wound to the abdomen which severed his aorta. The stab wound was 2½ inches above Dan's navel and traveled 5½ inches inside his stomach. The knife not only severed Dan's abdominal aorta, but it also glanced off his spine before lacerating the small intestine and the right kidney.

Sylvia Rackley, a friend of Juanita's for the past five years, testified for the prosecution. Sylvia had rented a room at Juanita's home and lived with her during 1985-86. Sylvia recalled that Dan and Juanita had a sexual relationship which lasted many years following their divorce. Sylvia said she observed, several years before the stabbing, a corn knife and meat cleaver in Juanita's truck. Sylvia asked Juanita what the weapons were for. Juanita replied that "when the time is right, I will have it there and I will chop." Sylvia said she asked Juanita that if she felt this way, why was she sleeping with Dan. Juanita replied, "This is how you get close to someone. This is how you stay close and have the opportunity, and then no one will believe I done it."

Juanita vehemently denied ever making these statements to Sylvia. Juanita also denied ever telling anyone that she wanted to kill Dan.

The record confirms that on August 31, 1989, the day before the stabbing, Juanita and Sylvia had talked on the telephone. Sylvia said that Juanita was depressed as a result of (1) her relationship with Dan; (2) Dan's relationship with Barb; and (3) Franz becoming closer to his father. Juanita told Sylvia, "Well, maybe I should just let them go." And then she said, "Maybe I should go ahead and let her have the money. I am trying to let it go." While Juanita admitted talking to Sylvia on August 31, 1989, she denied making any of these statements.

Dr. Noble Harrison, a clinical psychologist, testified for Juanita as an expert witness. Dr. Harrison opined that Juanita suffered from "battered woman syndrome." Dr. Harrison testified that even though her marriage to Dan had ended in 1984, Juanita's physical reaction at the time of the stabbing was an instinctive self-defense mechanism which resulted from Dan's previous physical abuse and his violent nature. Dr. Harrison explained that the "battered woman syndrome" was a psychological phenomenon suffered by women who are physically and psychologically abused over an extended period of time by the dominant male in their lives.

Here, the "battered woman syndrome" was used by Juanita as a self-defense theory. The "battered woman syndrome" was used to explain to the jury that Dan's stabbing was merely a logical reaction by Juanita as a result of Dan's prior violence. Dr. Harrison asserted that the "battered woman syndrome" explained Juanita's mental state and her behavior on September 1, 1989. Dr. Harrison claimed the "battered woman syndrome" caused Juanita to believe that she was in imminent danger of receiving a beating from Dan. He opined that Juanita's stabbing of Dan was merely a justified self-defense reaction. Dr. Harrison said he formulated his expert opinion based on several lengthy interviews with Juanita.

The jury was given instructions for first-degree murder, second-degree murder, and involuntary manslaughter. The jury returned a guilty verdict of involuntary manslaughter. Juanita was sentenced to three years' imprisonment.

Juanita's first argument is that the trial court's combination of jury instructions on the issues of "initial aggressor's use of force" and "use of force in defense of a person" was misleading and confusing. We disagree.

The trial court gave Illinois Pattern Jury Instructions, Criminal, No. 24—25.09 (2d ed. 1981) (hereinafter IPI Criminal 2d), which was submitted by the prosecution on the issue of "initial aggressor's use of force." It stated:

"A person who initially provokes the use of force against herself is justified in the use of force only if the force used against her is so great that she reasonably believes she is in imminent danger of death or great bodily harm, and she has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." (See IPI Criminal 2d No. 24—25.09.)

The trial court additionally gave Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (2d ed. 1981), which was tendered by the defense on the issue of "use of force in defense of a person." It stated:

"A person is justified in the use of force when and to the extent that she reasonably believes that such conduct is necessary to defend herself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to herself or another." See IPI Criminal 2d No. 24—25.06.

■■ The trial court ruled that based upon the evidence, the jury could reasonably find *either* Juanita or Dan to be the initial aggressor. Therefore, the trial court found that both of these instructions should be given to the jury. Based upon our review of the record, we agree that it was proper based on the evidence to give the jury both instructions.

From the evidence, the jury could easily have determined that Juanita was the initial aggressor because she bit Dan's penis and threatened to call Barb Egley. On the other hand, the jury could also have concluded that Dan was the initial aggressor when he pushed, shoved, and threatened Juanita before she picked up the knife.

We find that case law clearly supports the use of both of these jury instructions when there is an evidentiary basis for the instructions. (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340; *People v. Crue* (1977), 47 Ill. App. 3d 771, 362 N.E.2d 430.) The reason for giving both the "initial aggressor's use of force" and "use of force in defense of a person" instructions is so the jury may decide between the conflicting evidence and apply the correct law. That is exactly what happened in this case. We hold that it is proper to give both these jury instructions when there is conflicting evidence concerning the issues of self-defense and whether the decedent or the defendant was the initial aggressor.

Juanita argues that the jury should have been provided with a third, non-IPI self-defense instruction. Juanita alleges that such an instruction would prevent the jury from erroneously reading together the two instructions on "initial aggressor's use of force" and "use of force in defense of a person" and thereby avoid being confused. Juanita argues the third instruction would prevent the jury from thinking that Juanita had a duty to retreat whether or not she had provoked the decedent's use of force. The proposed non-IPI instruction reads as follows:

"It was up to the jury to decide whether or not defendant was the initial aggressor; that if, the jurors felt she was the initial aggressor, they should apply the initial aggressor self-defense instruction in determining whether the prosecution had disproved lawful justification beyond a reasonable doubt; and that, if the jurors felt she was not the initial aggressor, they should apply the regular self-defense instruction in determining whether the prosecution had disproved lawful justification beyond a reasonable doubt."

■ Juanita's proposed non-IPI instruction has two problems. First, it does not clearly, concisely, or impartially state the law to any greater degree than the two IPI criminal instructions which were given by the trial court. Finally, and fatally, the proposed non-IPI instruction was never tendered in the trial court. Generally, no party may raise on appeal the trial court's failure to give a jury instruction unless it was first tendered at trial. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248; *People v. Baylor* (1975), 25 Ill. App. 3d 1070, 324 N.E.2d 255.) Accordingly, we find that Juanita has waived this issue on appeal by failing to make both an objection at trial and to include this issue in a written post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Additionally, we find that the two IPI instructions which were given by the trial court do adequately state the appropriate law. We find no need for any further jury instructions based on the evidence presented at trial.

Juanita's major contention is that her constitutional right to a fair and impartial trial was denied because of improper prosecutorial comments made during closing argument. We agree.

Juanita specifically complains that the prosecutor, during his closing argument: (1) accused defense counsel and defense witnesses of conspiring to present a manufactured defense; (2) appealed improperly to the jurors' emotions; (3) minimized the prosecution's reasonable doubt burden; and (4) misstated the law on self-defense.

■ The standard of review to determine if a prosecutor's comments during closing argument constitute reversible error is whether those remarks were such that without their having been made, the jury might have reached a different result. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446.) In reviewing allegations of prosecutorial misconduct, the closing arguments of both the prosecution and defense must be examined in their entirety and the complained-of comments must be placed in the proper context. *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.

Prosecutors are allowed great latitude in closing argument and may argue all fair and reasonable inferences that can be drawn from the evidence introduced at trial. (*People v. Fort* (1976), 44 Ill. App. 3d 62, 357 N.E.2d 1365.) However, the prosecutor should refrain from presenting improper and prejudicial argument. (*People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734.) A conviction may be reversed if the prosecutor commits improper acts during closing arguments. *People v. Wolf* (1989), 178 Ill. App. 3d 1064, 534 N.E.2d 204.

Unless based upon some evidence, the prosecutor should not accuse defense counsel of the following: fabricating a defense (*People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41); or using improper tactics to win the case (*People v. Lavoy* (1980), 91 Ill. App. 3d 639, 415 N.E.2d 487).

A prosecutor is prohibited from presenting argument which is calculated solely to inflame the passions and prejudices of the jury. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132.) In determining whether a prosecutor's closing remarks are prejudicial, reference is made to the content of the language used, its relation to the evidence, and the effect of the argument on the right of an accused to a fair and impartial trial. *People v. Bragg* (1984), 126 Ill. App. 3d 826, 467 N.E.2d 1004.

During closing argument, the prosecutor made the following comments which clearly accuse defense counsel of fabricating a defense and of attempting to free the defendant by manufactured testimony, and accuse the witnesses of being well coached. The remarks were as follows:

"[D]o you remember all of those defense witnesses that came up, about like trained seals, up to that witness stand, acted on queue, told about the same thing. They were cross examined later, but they were all certainly playing their parts.

\* \* \*

\*\*\* There's no evidence that she was threatened with great bodily harm. There's no evidence that he said he was going to tear her head off either except she said it at this late date in the trial. She made that up for your trial here. If it had been true she would have told the Sheriff that. She would have gone into detail with the Sheriff, without coaching, without orchestration, without direction. \*\*\*

\*\*\*

Deputy Gronewold was there. He was a witness to what she said. Concept of self defense had not been fed to her yet. \*\*\*

* * *

The defense tipped its hand early in this case. As I said, the opening statement told how the case would be orchestrated, who the players would be and I think that what you have got here was a play. You got acting, a blinding of fact and figures which in the paperback book trade they call historical romances. Soap operas.

Even the psychologist who testified, a professional witness who was paid big bucks, ***. He said he hadn't known what purpose they were going to use his testimony for, so he didn't construct his report until he found out what they wanted, then he made it fit so he could testify for the defense here.

*** [W]hy did he have to wait until he found out what they wanted him to say before he wrote up his report.

Now, the defendant here had nothing to lose. She has confessed to tailoring her testimony under oath to suit her daily purposes. ***

* * *

*** I would not lie under oath, trained attorney, I feel it's wrong, but, really, if your mom was on trial for Murder, let's be honest, wouldn't you have a strong, strong temptation to say just about anything to get her off because you love your mom. ***

* * *

*** [T]hen they all got together with a paid psychologist down at her house, and the witnesses that testified said they knew that the psychologist was going to use what they told the psychologist here in front of you. It's all cooked up. They knew it would be like pouring it in a funnel and they would take it here and use it to help the defendant.

* * *

*** What he was, he was like a hired gun. He was like, what he told you was something like a Sunday supplement article might be about the Battered Wife Syndrome or something that came out in the Geraldo show.

If he was a real psychologist there would have been counseling and trying to help someone ***. If you're not really going to counsel them, then, heck, who cares. You can make it up as you go along.

*** He had portfolios. He had travel. This doesn't show—have gun will travel. *** He was a professional witness and he was good at what he did.

***

*** He just told what they thought would work for an express purpose in this trial, to fool you.

Did they succeed? Can you buy your way out? ***
* * *

Don't forget when you grade the testimony of the witnesses, the interests, the bias, the prejudice they have, don't forget Dr. Harrison was paid highly. ***
***

And he studied the works of a psychiatrist who studied astrology and the Chinese book of chances. I think you all know what that is. You get so many coins in your hand and throw them down. There's so many heads and so many tails and you turn to a little page in the book and it will tell you what's going to happen in the future. Talk about magical thinking, I don't think that's too sound a foundation for a psychologist at all."

■ Whether each of these statements individually amounts to reversible error is not an issue which is necessary for us to reach. Rather, it is the cumulative effect of these remarks which is devastating. We believe that Juanita's constitutional right to a fair and impartial trial was compromised by the cumulative effect of the prosecutor's remarks. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §13.

It is a basic principle of our criminal justice system that the prosecutor owes the defendant a duty of fairness. This duty extends throughout the trial and includes closing statements. Therefore, the prosecutor has an ethical obligation to refrain from presenting improper and prejudicial argument. *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68; See I ABA Standards for Criminal Justice, *The Prosecution Function* §§3-5.6, 3-5.8 (2d ed. 1982).

The State asserts that Juanita has waived on appeal any argument that the prosecutor's comments were improper because they were not objected to during trial. The State correctly points out that in order to properly preserve a matter for review, a trial objection and a written post-trial motion specifically articulating the issue sought to be raised are required. (*Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) Juanita acknowledges this fact, but urges this court to address the issue under the plain error exception to the waiver doctrine.

In order to overcome the waiver doctrine, the defendant must establish that the error now complained of on appeal was a plain error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) In other

words, it must be plainly apparent from the record that an error substantially affecting the rights of the defendant occurred. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) The purpose of the plain error exception to the waiver doctrine is to correct any serious injustices which have been done to a defendant so that she is not denied her right to a fair and impartial trial. *People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513.

We find from the record that only one of the prosecutor's comments we have cited was objected to at trial by Juanita's counsel. However, whether or not the improper remarks were objected to at trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied or the verdict of the jury may have resulted from the improper comments. *Carlson*, 79 Ill. 2d at 577, 404 N.E.2d at 239.

We believe that a grave injustice would occur if we accept the State's waiver argument. We find from the record that it is plainly apparent that the cumulative effect of the prosecutor's improper remarks denied Juanita her constitutional right to a fair and impartial trial. Therefore, we must, in order to preserve justice, invoke the plain error exception to the waiver doctrine.

We find the evidence in this case was closely balanced. We cannot say with a reasonable degree of certainty that the prosecutor's improper remarks did not contribute to Juanita's guilty verdict. Also, we cannot say that the jury could not have reached a contrary verdict had the improper remarks not been made. Therefore, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

As a result of our holding, we find that it is unnecessary to address any of the remaining issues raised on appeal.

For the reasons indicated, the judgment of the circuit court of Hancock County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

GORMAN and HAASE, JJ., concur.