THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AGENOR ROMAN, Defendant-Appellant.

First District (3rd Division)    No. 1—00—1836

Opinion filed July 5, 2001.

Rita A. Fry, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Kelli A. Fogarty, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HALL delivered the opinion of the court:

On June 10, 1999, the defendant, Agenor Roman, was charged with one count of unlawful use of a weapon on residential property owned, operated and managed by the Chicago Housing Authority (CHA) (720 ILCS 5/24—1(a)(4), (c)(1.5) (West 1998)),[1] and one count of aggravated assault of a peace officer (720 ILCS 5/12—2(a)(6) (West 1998)). Two other charges were dismissed prior to trial.

Following a jury trial, the defendant was found not guilty of aggravated assault of a police officer but was found guilty of unlawful use of a weapon on CHA property. The defendant was sentenced to a term of 24 months' probation.

The defendant appeals, raising the following issues: (1) whether the admission of evidence that the arresting officer received an award of valor in connection with this case denied the defendant a fair trial; (2) whether the defendant was denied the effective assistance of counsel; and (3) whether remarks by the prosecutor denied the defendant a fair trial. We reverse and remand for a new trial.

The trial proceedings in this case are summarized below.

### For the State

Andrew Sobolewski, a detective with the City of Chicago police department, testified that on June 10, 1999, at approximately 11:30 p.m., he was working in the area of the Lathrop CHA housing project. As he was proceeding west on Diversey, he observed several individu-

---

[1]The defendant's indictment on these charges actually read "owned, operated *or* managed." (Emphasis added.) However, that change to the statute was not effective until December 22, 1999. (see Pub. Act 91—673, § 10, eff. December 22, 1999), after the acts were committed in this case.

als standing on the sidewalk who appeared to be having what Detective Sobolewski termed a "confrontation." He then observed one person from the group walk southbound between two apartment buildings. He described the person as a male Hispanic, between 16 and 19 years of age, dressed in dark clothing, including a dark, hooded sweatshirt. Detective Sobolewski identified this individual as Eric Rodriguez. After receiving some information from a woman at the scene, he radioed for assistance. When Officers Brant and Gevrekis arrived at the scene, Detective Sobolewski gave them a description of Mr. Rodriguez and the information he had received from the woman. Officers Brant and Gevrekis left in their squad car to look for Mr. Rodriguez.

Within a minute of losing sight of their squad car, Detective Sobolewski heard four or five gunshots and received a call from the officers that shots were being fired at them. When he arrived at the location where the officers had indicated they were, he found their empty squad car and called for further assistance. As he traveled southbound on Leavitt toward Hoyne Street, he heard radio transmissions of a man shot and proceeded to the location of the shooting. At the entrance way to a building at 2742 North Hoyne, he saw the defendant, who lay in the hallway, bleeding.

Detective Sobolewski spoke with Officer Claeson, who told him what had occurred. Detective Sobolewski observed several stairs going down to the basement area. At the bottom of the basement stairs, he observed a semi-automatic handgun next to the basement door. The defendant was lying several feet away from the downstairs.

Eddie Gevrekis, a police officer for the City of Chicago, testified that after his partner, Officer Tom Brant, and he had been briefed by Detective Sobolewski, they drove southbound on Leavitt. At 2741 Leavitt, he observed two male Hispanics at the opening of a gangway at that location, one wearing all black clothing and the other all white clothing. Officer Gevrekis identified the defendant as the individual dressed in the all white clothing. The two individuals were standing next to each other. The individual dressed in black displayed a weapon and began firing at the officers. As Officer Gevrekis returned fire, the defendant ran eastbound down a gangway that leads onto Hoyne Street where there is a courtyard.

The individual in black fired one more shot at the officers, and Officer Gevrekis fired four more times. Officer Brant called in that they were being fired upon. The officers pursued the individuals but lost sight of them. On the way back to the squad car, they heard four more shots coming from the courtyard area that they had seen the defendant enter. Later, Officer Gevrekis observed the defendant being placed in an ambulance.

Dean Claeson, a police officer for the City of Chicago, testified that his partner, Officer William Smith, and he responded to Officers Gevrekis and Brant's call that shots were being fired at them. Officer Claeson was wearing shorts, a T-shirt and his bulletproof vest. Officers Claeson and Smith arrived at 2742 Hoyne and proceeded to the back of the building between 2742 Hoyne and the rowhouses that were south of it.

After searching the building, Officer Claeson went back to the front of the building and entered a doorway at 2742 North Hoyne. He noticed that the door was open all the way up against the wall. He proceeded into the doorway and pulled the door back, whereupon he observed an individual, whom he identified as the defendant, squatting down and pointing a firearm at him. He then opened fire. The defendant was about a foot away from him. Officer Claeson later learned that he had fired four shots.

After he fired his weapon, Officer Claeson backed out of the doorway, pulling the door back. Officers Smith, Graves and another officer arrived and pushed back the door. The defendant lay on the landing of the stairway, bleeding. Officer Graves retrieved the weapon that the defendant had allegedly pointed at Officer Claeson from the bottom of the stairway.

On cross-examination, Officer Claeson testified that he did not remember what hand the defendant was holding the weapon in. He just remembered seeing the weapon pointed at him, and fearing for his life, he fired. Officer Claeson did not remember the defendant saying anything to him, nor did he hear another officer say to the defendant, "I hope you die." Officer Claeson denied saying that he had shot the wrong person.

On redirect examination, Officer Claeson testified that, following an investigation of the shooting, he was given an award for valor, which meant bravery above and beyond the call of duty.

Michael Naughton, a detective with the City of Chicago police department, testified that on June 10, 1999, his partner, Rich Szczetkowicz, and he responded to a call of officers being shot at. After arriving at Diversey between Leavitt and Hoyne, the detectives walked south through a courtyard between the buildings, at which point they heard four shots coming from around 2742 Hoyne Street. They met Officer Claeson coming out of the door saying "he had a gun." Detective Naughton looked and saw an individual, whom he identified as the defendant, on the floor. He also observed a gun at the bottom of the stairs about four or five feet from where the defendant was lying.

On cross-examination, Detective Naughton testified that he did not know how the gun got down to the bottom of the stairs. The gun

was negative for fingerprints. He did not know if the gun was tested for blood. On redirect examination, Detective Naughton explained that there were prints on the gun but that they could not be compared. On re-cross-examination, Detective Naughton further explained that it did not mean that the prints had been wiped off of the gun.

The parties stipulated that the property at 2742 North Hoyne, known as the Lathrop Homes, was owned, operated or managed by the CHA on June 10, 1999.

At the close of the State's case, the defendant moved for a directed verdict which was denied by the trial court.

### For the Defense

Michelle Jackson testified that on June 10, 1999, she lived at the Lathrop Homes. Late that evening, she and her boyfriend, Patrick, were walking down the street toward Diversey having an argument. As they were arguing, twice someone shouted from the third floor of a building, "who is that?" Ms. Jackson and Patrick ignored the question both times. The third time, the person said that if they did not answer he was going to shoot at them, and when they did not respond, they were shot at. As they continued to walk to the corner, four men came running after them, one of whom had a gun. The one with the gun was called "Emo" by the others, but Ms. Jackson knew him as "Eric." Ms. Jackson recognized one of the other men as "Ismal." Eric held the gun to Patrick's head, asking who they were and why they were in his neighborhood. Eric was dressed in dark-colored, knee-length shorts and a long-sleeved "hoodie." One of Ms. Jackson's children, who was with her, began to scream, and Ms. Jackson flagged down a passing police car. The men ran off.

After waiting for the police officer to return, Ms. Jackson and Patrick began walking south down Hoyne. Eric and the other men appeared, and Eric called her names for stopping the police car. Eric put the gun in her face and told her he would shoot her if she talked to the police again. Eric kicked Patrick, and then the police arrived. After she returned home, she heard 10 gunshots in a row.

Ms. Jackson knew the defendant just to say hello to him. He was not one of the four men who threatened her. Ms. Jackson described the defendant has having something wrong with one of his arms and hands and that he walked with a very bad limp.

Other than when she flagged down the police officer, Ms. Jackson did not talk to the police until several days after the incident because she was frightened of the "gang bangers" that lived in the "projects." Eric was a "gang banger"; he belonged to the Latin Kings. She told the police officer she spoke to what had happened to her on the night of the incident.

On cross-examination, Ms. Jackson testified that the first time she had ever seen Eric/Emo was on June 10, 1999. On redirect examination, Ms. Jackson testified that she had never seen the defendant run. When he did walk, it was with a bad limp that was noticeable from a distance.

Sheila Coleman testified that on June 10, 1999, she lived at 2745 North Hoyne in the Lathrop Homes. Sometime between 11 p.m. and 11:30 p.m., she heard gunshots. She started across the street to the courtyard looking for her 13-year-old daughter when she heard gunshots again, coming from building near the courtyard. She saw a man standing and shooting. The man had on jeans, tennis shoes, and a T-shirt with what looked like a vest over it. The man also wore a holster. She thought he was a police officer although she did not recognize him as one of the regular "beat cops."

As the man backed out of the doorway, Ms. Coleman could see the gun in his hand. He then dropped his gun down and said, "damn, I shot the wrong m----r f----g one. That's not Emo."

On cross-examination, Ms. Coleman testified that she did not see the man with the gun go back into the hallway. She knew who the defendant was but knew him by the name of "Junito." When she told one of the officers at the scene that she had seen what had happened, he told her "you can go to jail too." So she returned home. She acknowledged that she told an investigator from the State's Attorney's office that she would not make a statement until after she had spoken with the defense attorney. There was at least one other officer present when the man stated that he had shot the wrong person.

Iris Hernandez, the defendant's aunt, testified that on June 10, 1999, she lived at 2738 North Hoyne in the Lathrop Homes. The defendant was born with cerebral palsy, which paralyzed his left side a little bit, affecting his left hand. He also limped when he walked.

Between 10:30 p.m. and 10:45 p.m., she heard gunshots and, looking out her second-floor window, she observed a police officer, dressed in shorts and white gym shoes, shooting inside a hallway at 2742 North Hoyne. She saw a person's leg lying inside the doorway. She then called 911. She observed more police officers standing out there and talking.

On cross-examination, Ms. Hernandez testified that the defendant had white clothes on that night. She described the officer who was shooting as a white male, with white hair, wearing blue shorts, a white T-shirt, a vest and white gym shoes.

Eladio Irizarry testified that he was employed by the CHA as a maintenance worker. On June 10, 1999, he went to the Lathrop Homes to pick up his bicycle, which was being painted by someone who lived

there. He arrived there at between 10 p.m. and 10:30 p.m. While he was picking up his bicycle, he saw the defendant, whom he knew from the neighborhood. The defendant was handicapped, with a very bad limp, and one of his arms was twisted. As Mr. Irizarry was putting the bicycle in his truck, he was joking with the defendant, who wanted to ride the bicycle. While they were talking, there was a shooting of some sort, and people began running. The defendant did his best to run too but he could only drag himself away.

Mr. Irizarry drove his truck around the corner but, concerned about the defendant, he turned around to see if everything was all right. He drove around Leavitt and came back down Hoyne. Another shooting occurred, and people were screaming what he thought was "Junito." Mr. Irizarry went to see if that person was the one he had been talking to, but, after seeing him lying on the hallway floor, he could not tell at first. The police were telling everyone to get back. However, Mr. Irizarry walked in and heard a police officer, who was dressed in short pants, say that he shot the wrong child. Another officer told him not to say anything more and asked if the defendant had a weapon on him. When the officer said no, the other officer told him that he had better find one. The police then told Mr. Irizarry to leave.

On cross-examination, Mr. Irizarry testified that he did not know the defendant by name, even by his nickname, but he knew the defendant's parents and knew where the defendant's grandmother lived, due to his job with the CHA. When everyone began to run, the defendant was not running but was able to move.

Mr. Irizarry thought he was wearing his work uniform that night, which was light blue with navy blue pants. He walked straight into the area where the police officers were standing and talking. He thought that the officers may have thought that he was also a police officer. He never approached one of the officers canvassing the neighborhood to tell them what he had heard because he was afraid to get involved. Although he considered contacting a news station and his alderman, because of his concern for his job and his family, he never contacted the police or followed through reporting what he had heard.

On redirect examination, Mr. Irizarry testified that he did tell an investigator from the State's Attorney's office what he testified to in court.

The defendant testified that he is 19 years of age, and his nickname is "Junito." On June 10, 1999, he was living with his grandmother at 2760 Clybourn. He was born with cerebral palsy and suffers from seizures. Because of his cerebral palsy, if he runs fast, he will trip and fall. His left arm is so bad that he cannot tie his shoe.

The defendant knew Eric Rodriguez; Eric was a friend of his and they hung out together. However, he did not see Eric on June 10, 1999. Late in the evening of June 10, 1999, the defendant was in front of his aunt's house in the courtyard. He spoke to Mr. Irizarry and asked him if he could ride his bicycle. About 11:30 p.m., he heard shots coming from the back of Hoyne. There were other people standing around. Fearing for his safety, the defendant decided to hide in the hallway behind the door. He was there four or five minutes when an officer came in and saw him behind the door. The officer shot four times at him, hitting him once. The shot hit him in the left arm, then passed through his testicles and exited by his hip. The defendant was facing the door looking directly at the officer.

Defense counsel then had the defendant remove his sweater and shirt to show the jury the path of the bullet. The defendant testified that when he was shot, he did not fall down. He asked the officer why he had shot him. The officer told him to shut up and to lie on the floor. The defendant denied having a gun. No one ever asked him if he had a gun.

Defense counsel then asked the defendant about the crown tattoo on his arm. The defendant explained that the it stood for the Latin Kings. The defendant denied that he was a "big shot" in the Latin Kings. He acknowledged that he had been a member of the Boy Scouts.

The defendant denied pointing a gun at the police officer or running away from any police officers who were shooting at him. He further denied being with Eric Rodriguez when Eric was shooting at the police.

On cross-examination, the defendant testified that Eric Rodriguez was also a Latin King.

The defendant further testified that when the gunshots were heard, most of the people went into Diana's house. Diana was one of the people standing outside with the defendant. Because he was arguing with Diana, he did not think she would let him into her house. The defendant acknowledged that he could hold a gun in his right hand.

## Rebuttal

Officer Claeson testified and denied saying that he shot the wrong person. The first time he heard the name "Emo" involved in the case was a week after the June 10, 1999, incident. Officer Claeson denied that he was ever told to keep quiet about the incident or that if there was no weapon that he had better find one. He did not see a janitor in the courtyard that night. He could tell the difference between a janitor's uniform and a Chicago police department uniform.

Officer Naughton testified that, after hearing the shots fired, it took him about 15 seconds to reach the scene at 2742 North Hoyne. He never heard Officer Claeson say that he shot the wrong man. He also never heard any officer say to Officer Claeson that he should not say any more or that there was no weapon and that he had better find one. No one other than the police officers was at the scene in the courtyard. He did not see anyone dressed like a janitor there. He thought he would know the difference between a janitor's uniform and that of a police officer. Except for the detectives, all the police officers were wearing bulletproof vests.

Following deliberations, the jury found the defendant not guilty of aggravated assault of a peace officer and guilty of unlawful use of a weapon on CHA property. The trial court imposed a sentence of 24 months' felony probation.

## ANALYSIS

The defendant contends that the admission into evidence that Officer Claeson received an award of valor in connection with this case denied him a fair trial.

At the outset, the State contends that the defendant has waived this issue on appeal because he failed to object to Officer Claeson's testimony regarding his award for valor and failed to raise the error in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). The defendant responds that this court should consider the issue under the plain error doctrine. See 134 Ill. 2d R. 615(a).

●1 The plain error doctrine permits a court to consider an error not properly preserved at trial where the evidence is closely balanced or the alleged error was so substantial as to deny the defendant a fair proceeding. *People v. Emerson*, 189 Ill. 2d 436, 479, 727 N.E.2d 302, 326 (2000). The admission of this evidence impacts the credibility of the State's main witness against the defendant. Since this case ultimately came down to whether the jury believed Officer Claeson's testimony that the defendant possessed a gun or the defendant's testimony that he did not possess a gun, the evidence is closely balanced, and therefore, this court will consider the merits of this issue.

The defendant contends that the admission of evidence that Officer Claeson received an award of valor was error. The defendant argues that such evidence was both hearsay and irrelevant.

●2 Hearsay evidence is " ' "testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." [Citation.]' " *People v. Singletary*, 273 Ill. App. 3d 1076, 1081, 652

N.E.2d 1333, 1336 (1995), quoting *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963).

The State argues that Officer Claeson's testimony that the award of valor meant that he had performed his job correctly directly rebutted the defendant's assertion that Officer Claeson believed that he had shot the wrong person and needed to "frame" the defendant.

Neither party cites any Illinois cases dealing with the admission of awards of valor to police officers as evidence of credibility. However, the defendant relies on *United States v. Nazzaro*, 889 F.2d 1158 (1st Cir. 1989). In that case, the defendant attempted to offer into evidence anecdotal proof of commendations he had received while serving in the military police and as a police officer. The court of appeals held that such awards and commendations did not evidence character traits pertinent to the crimes with which the defendant was charged and that such evidence seemed to be classic hearsay and inadmissable on that basis as well. *Nazzaro*, 889 F.2d at 1168.

The State responds that the *Nazzaro* court's holding is not persuasive because the court stated only that such evidence "seemed" to be hearsay. The State notes that the *Nazzaro* court relied on *United States v. Barry*, 814 F.2d 1400 (9th Cir. 1987). The court in *Barry* found that letters of commendation were hearsay but did not address the issue of awards. *Barry*, 814 F.2d at 1404.

A statement, not technically introduced for the purpose of its truth, is still hearsay when its purpose is to prove the implicit assertion in the statement. See *People v. Thomas*, 178 Ill. 2d 215, 237, 687 N.E.2d 892, 902 (1997).

●3 We agree with the defendant that the evidence of Officer Claeson's award for valor was hearsay and as such inadmissible. Not only did Officer Claeson testify that he had received the award, but he explained that the award was given for bravery and acting beyond the call of duty. That Officer Claeson was honored for his conduct in this case was an out-of-court statement that was introduced for the purpose of proving that he had acted correctly in shooting the defendant.

Even if we were to conclude that the award of valor was not hearsay evidence, it was still error to admit that evidence on the grounds of relevance.

●4 The test to determine the admissibility of evidence is whether it fairly tends to prove the particular offense charged; whether that which is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, *i.e.*, whether it is relevant. *City of Rockford v. Elliott*, 308 Ill. App. 3d 735, 739, 721 N.E.2d 715, 718 (1999). Evidence is relevant when it tends to prove a disputed fact or render the matter in issue

more or less probable in light of logic, experience, and accepted assumptions of human behavior. *Elliott*, 308 Ill. App. 3d at 739, 721 N.E.2d at 718. Although the court and the State are under a duty to avoid the introduction of evidence whose prejudicial effect outweighs its relevance, relevant, admissible evidence need not be excluded simply because it tends to prejudice the accused. The trial court must weigh the relevance of the evidence against its prejudicial effect on the defendant. *Elliott*, 308 Ill. App. 3d at 739, 721 N.E.2d at 718. It is within the discretion of the trial court to determine whether evidence is relevant and admissible. *Elliott*, 308 Ill. App. 3d at 739, 721 N.E.2d at 718.

Whether Officer Claeson received an award for valor for his conduct in this case does not tend to prove that the defendant committed either of the offenses charged or to disprove the defendant's testimony that he did not have a gun in his possession on June 10, 1999.

●5 Not every error requires reversal. Error is harmless where a reviewing court can safely conclude that a trial without the error would have produced no different result. *Elliott*, 308 Ill. App. 3d at 740, 721 N.E.2d at 719. A crucial issue in this case was the credibility of Officer Claeson. Since the effect of the complained-of evidence was to inform the jury that Officer Claeson had been honored for his role in this case, we cannot say that the evidence did not influence the jury's decision here.

Therefore, we conclude that the admission of this evidence was plain error and requires that the defendant receive a new trial.

While it is unnecessary to address the remaining errors raised by the defendant, as the likelihood of the same specific errors occurring on retrial is remote, nevertheless, the prosecutor's remarks in closing argument merit comment.

Prosecutors are allowed great latitude in closing argument and may argue all fair and reasonable inferences that may be drawn from the evidence introduced at trial. *People v. Dunsworth*, 233 Ill. App. 3d 258, 267, 599 N.E.2d 29, 35 (1992). However, a prosecutor should refrain from presenting improper and prejudicial argument. *Dunsworth*, 233 Ill. App. 3d at 267, 599 N.E.2d at 35. A conviction may be reversed if the prosecutor commits improper acts during closing argument. *Dunsworth*, 233 Ill. App. 3d at 267, 599 N.E.2d at 35.

●6 While the prosecutor is allowed wide latitude in closing argument, the comments must be based on evidence admitted at trial or on any reasonable inferences therefrom. *People v. Bullock*, 154 Ill. App. 3d 266, 273, 507 N.E.2d 44, 49 (1987). Several times the prosecutor commented on the defendant's lack of respect for police authority,

comparing him to individuals who carried out premeditated attacks on unarmed persons (*i.e.*, Columbine High School). However, nothing in the facts of this case indicated that the defendant armed himself with the intent of shooting a police officer that night or that the defendant pointed the gun at Officer Claeson only because he was a police officer, as opposed to any individual who might have confronted the defendant in his hiding place. Although the defendant did not object to this remark, the mention of Columbine High School was improper. See *People v. Barnes*, 107 Ill. App. 3d 262, 268-69, 437 N.E.2d 848, 852 (1982) (improper for the State to inject into the case the image of a mass murderer, John Wayne Gacy).

The complained-of remarks also included a reference to "selling drugs" and "sticking up old ladies." The fears and prejudices of the jurors can also be aroused by improper references to drug dealing. *People v. Terry*, 312 Ill. App. 3d 984, 992, 728 N.E.2d 669, 676 (2000).

The State responds that the prosecutor did not argue that the defendant was selling drugs or "sticking up old ladies." However, as there was no evidence of drugs or drug selling in this case, any reference to drugs was improper.

The State argues that the prosecutor's statement that the victims in this case were the senior citizens and the children who were afraid to be on the streets because of criminals like the defendant was proper as it was in response to the defense counsel's portrayal of the defendant as a poor handicapped child and the true victim in this case. However, according to the evidence in this case, on the night of the incident, many people, including children, were outside in the neighborhood prior to the shooting.

Improper remarks require reversal only if they substantially prejudice a defendant. *Terry*, 312 Ill. App. 3d at 993, 728 N.E.2d at 677. It has been held that a prosecutor's improper remark in closing argument does not prejudice a defendant where the trial court immediately instructs the jury to disregard the remark and later instructs the jury that closing arguments are not evidence and that it should disregard arguments not based on the evidence. *Terry*, 312 Ill. App. 3d at 993, 728 N.E.2d at 677.

In the present case, when defense counsel did object, the trial court never ruled on the objections and did not instruct the jury to disregard the improper remarks. The trial court merely instructed the jury that the arguments were not evidence and to only consider the evidence. By failing to sustain the objections and to instruct the jury to disregard the remarks, the trial court may have unintentionally misled the jury into believing that the prosecutor's remarks were based upon the evidence and therefore could be considered.

Moreover, in an appropriate case, even the sustaining of objections to the improper remarks of the State will not cure the error where the misconduct was flagrant and tainted the entire trial. *Terry*, 312 Ill. App. 3d at 993, 728 N.E.2d at 677. Even if the court were to conclude that each instance of improper conduct, by itself, did not require reversal, the cumulative effect of the instances of misconduct may require a new trial. *People v. Brown*, 113 Ill. App. 3d 625, 630, 447 N.E.2d 1011, 1015 (1983). Improper argument is especially serious where evidence of the defendant's guilt is not overwhelming. *Terry*, 312 Ill. App. 3d at 994, 728 N.E.2d at 677.

The instances of improper argument in this case, coupled with unwillingness of the trial court to rule on the defendant's objections when they were made, might very well have influenced the jury's verdict given the closeness of the evidence in this case. We trust that the defendant's retrial in this case will not suffer from the same deficiencies.

The defendant's conviction and sentence are reversed. Because there was sufficient evidence in the record to support the defendant's conviction, the cause is remanded for a new trial.

Reversed and remanded.

CERDA and WOLFSON, JJ., concur.