# Illinois Official Reports

## Appellate Court

---

### *People v. Smith*, 2014 IL App (1st) 103436

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SALLETHEO SMITH, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-3436 |
| Filed | July 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court rejected defendant's contentions that his convictions for first-degree murder, attempted first-degree murder and armed robbery should be reversed because the trial court admitted firearms evidence without a proper foundation, his attorney was ineffective in failing to object to the admission of that evidence, the prosecutor improperly remarked in closing argument that defendant "had four years to think about" his story, and that his request for an instruction on involuntary manslaughter was improperly denied; however, his sentence for armed robbery including the 15-year firearm enhancement was vacated and the cause was remanded for resentencing, where the sentence-enhancement provision did not apply to defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-27754; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Carolyn R. Klarquist, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion.

## OPINION

¶ 1    A jury convicted defendant Salletheo Smith of first-degree murder, attempted first-degree murder, and armed robbery. The trial court sentenced defendant to consecutive terms of 45 years, 30 years, and 21 years in prison. Smith appeals his conviction and sentence, raising five issues: (1) he was denied a fair trial where the trial court allowed the State to introduce firearms evidence without laying a proper foundation; (2) his attorney was ineffective for failing to object to the inadmissible firearms evidence; (3) the State deprived him of a fair trial by remarking in closing argument that he "had four years to think about the story" he told the jury; (4) the trial court erred in denying his request for a jury instruction on the lesser offense of involuntary manslaughter; and (5) he should be resentenced on the armed robbery count because the trial court imposed an unconstitutional 15-year firearm enhancement. We find that the State laid an adequate foundation for the admission of the firearms evidence and that defendant's trial counsel was not ineffective for failing to object to that testimony. We also conclude that the prosecutor's remark did not prejudice defendant and that the trial court did not abuse its discretion in denying defendant's request for an involuntary manslaughter instruction. We agree with defendant, however, that he should be resentenced for his armed robbery conviction.

¶ 2                                   I. BACKGROUND

¶ 3    Felicia Jordan and Kareem Black married in 2000 but separated in 2004. Black moved to Iowa while they were separated. During that time, Jordan began dating defendant. Jordan and defendant lived together for about six months until Jordan moved to Matteson, Illinois.

¶ 4    Jordan testified that, when she moved to Matteson, she broke up with defendant because he became "mean," "evil," and "controlling." According to Jordan, defendant was not happy about breaking up, but he promised to leave her alone. Jordan testified that defendant continued to try to pursue a romantic relationship with her, however. She said that she woke up "a couple times" to find defendant standing in her room at night. Jordan did not call the

- 2 -

police after defendant entered her home at night because "he said that he would back off." Jordan said that she did not give defendant a key to her house, but she gave him a key to her garage so he could store his personal items there. She testified that defendant eventually returned the key to her garage. She also let defendant keep his dog at her house for a brief period of time.

¶ 5        Jordan testified that Black came to visit her on November 7, 2006. In the late evening hours, Jordan borrowed her mother's car and picked Black up from the bus station. Upon arriving at home, Jordan placed an oven rack on the inside of the door so that she could hear if anyone opened it. Jordan testified that she did not tell the police that she put the rack against the door so that she could hear if defendant came in.

¶ 6        Jordan and Black were about to go to bed when she heard a noise outside. Both Jordan and Black were nude. After hearing the noise, Jordan heard someone outside her bedroom door, trying to open it. Jordan tried to push the door shut and she saw that defendant was on the other side of the doorway. Defendant tried to enter the bedroom, but Jordan pushed him back. Meanwhile, Black stood by the window in the bedroom. Defendant forced his way into the room and accused Jordan of cheating on him. He held a black gun with "wood grain around it."

¶ 7        Jordan testified that defendant fired three shots, hitting Black in the chest. Black fell to the ground and Jordan began to struggle with defendant over the gun. Defendant fired the gun at her while she was on her knees, striking her in the cheek and knocking off part of her earlobe. Jordan testified that one of the bullets defendant shot ricocheted off of the floor of her bedroom and went into the ceiling. She acknowledged that she did not see the bullet ricochet off of the ground and that she did not see the bullet until it was taken out of her ceiling. Jordan testified that defendant fired five shots total. Jordan tried to call the police, but defendant knocked the phone out of her hands. Defendant then tried to stomp on Black while Jordan fought him off.

¶ 8        Jordan testified that defendant then took her mother's keys off of her dresser. Jordan and defendant struggled over the keys as defendant dragged Jordan down the hall. Defendant broke free from Jordan and ran out of the front door of the house. Defendant drove away in Jordan's mother's car–a silver Suzuki XL7–and Jordan called 911. A tape of Jordan's 911 call was played for the jury.

¶ 9        The parties stipulated to the testimony of Corporal Sheets of the Park Forest police department. In the early morning hours of November 8, 2006, Sheets participated in a high speed chase of a silver Suzuki XL7 that concluded outside a forest preserve.

¶ 10       Around 1:50 a.m. on November 8, 2006, Officer Aaron Dobrovitz of the Matteson police department responded to Jordan's house. Upon arriving, Dobrovitz saw that Jordan was bleeding from her right ear and right cheek. Jordan was visibly upset and hysterical. Dobrovitz noticed three fired cartridge cases in Jordan's house: one on the floor of the living room near the hallway, one near the entrance to the bedroom, and another in the bedroom doorway. There was a bullet hole in the ceiling of the bedroom and a cordless phone with the back missing on the floor. Dobrovitz testified that Jordan's front door did not have any damage or signs of forced entry.

¶ 11       In the master bedroom, Dobrovitz saw Black, naked, lying between the bed and the wall, bleeding from a wound under his left arm. Black was gargling from his mouth and was

unresponsive. Dobrovitz waited with Black until the paramedics arrived and took him to the hospital, where he was later pronounced dead.

¶ 12    Dr. Claire Cunliffe of the Cook County medical examiner's office performed an autopsy of Black's body. The State admitted a certified copy of Cunliffe's report in lieu of her live testimony. Black had two gunshot wounds, one on the left side of his body and another on his upper left arm. Cunliffe recovered "a small caliber, copper jacketed bullet" from Black's chest. According to the report, Cunliffe submitted "the recovered bullet *** to a representative of the Cook County Sheriff's Police Department" and received a receipt.

¶ 13    Officer Tara Daniels-Davis, an evidence technician with the Cook County sheriff's police department, observed Black's autopsy on November 8, 2006. Davis identified State's Exhibit 5 as "the projectile envelope that [she] received from Dr. Claire Cunliffe." Daniels-Davis testified that the envelope was sealed when she received it from Cunliffe. The envelope was in the same or substantially the same condition in court as when Cunliffe gave it to her, except for "the taping on the bottom." Daniels-Davis turned the sealed envelope over to Detective White of the Matteson police department.

¶ 14    Detective Shawn White of the Matteson police department went to the Cook County medical examiner's office on November 8, 2006. White identified State's Exhibit 5 as "the envelope *** with [a] projective [*sic*]" that he received from Officer Daniels-Davis. The envelope was sealed when Daniels-Davis gave it to White. White did not know how many bullets were in the envelope; he was just told that there was a projectile inside of it. White testified that State's Exhibit 5 was in the same or substantially the same condition as when he received it, other than a sticker and some tape that were on the envelope. White took the envelope back to the Matteson police department, after which it was sent to the Illinois State Police crime lab. White testified that the envelope was sealed when it was sent to the Illinois State Police.

¶ 15    Lieutenant Matt Rafferty of the Cook County sheriff's police department testified that, on November 9, 2006, he arrested defendant at a Chicago police station, where he was being held under the name "Brian Jones." Rafferty showed defendant a copy of a police bulletin with his picture, and defendant told Rafferty his real name.

¶ 16    William Lance Collins testified that, on November 7, 2006, he lived with defendant at 248 Arcadia Street in Park Forest, Illinois. Before Collins went to work that day at 3 p.m., he saw defendant with a "small caliber handgun." The gun was black with a brown handle. Collins said the gun was a .25-caliber, but also testified that he had no training in firearms and was not sure what type of gun it was.

¶ 17    Collins testified that, after returning from work at 11 p.m. on November 7, he dropped defendant off at a street corner near Jordan's house. Collins said that Jordan was defendant's girlfriend and that defendant was in a good mood that night.

¶ 18    Before the close of the State's case-in-chief, the court admitted State's Exhibit 5 into evidence. Defense counsel did not object.

¶ 19    Defendant testified that he and Jordan made plans for defendant to spend the night at Jordan's house on November 7, 2006. Defendant testified that Jordan had given him a key to her house earlier that day. In preparation, defendant packed a duffel bag with clothing, toiletries, and pornographic movies that he and Jordan had watched together. Defendant also took a pizza from his mother's freezer to bring to Jordan's house. Defendant testified that he

never went to Jordan's house uninvited but, on cross-examination, he admitted telling the police that he sometimes went to her house uninvited. Defendant said that his relationship with Jordan was "a lot of on and off." According to defendant, as of November 7, 2006, he and Jordan were discussing getting back together.

¶ 20　Defendant testified that he owned a .45-caliber, wood-grain gun. Defendant said that this was the gun that Collins saw him with on the afternoon of November 7, 2006. Defendant denied bringing his gun to Jordan's house.

¶ 21　Defendant testified that Collins drove him to the corner near Jordan's house. Before entering Jordan's house, defendant went into her garage through a side door and smoked marijuana in Jordan's car. He testified that he did not want to smoke in her house because he did not want it to smell. According to defendant, Jordan ran a daycare service out of her house, so "that's where we usually smoked[,] in the garage." Defendant fell asleep in Jordan's car until the cold woke him up.

¶ 22　After waking, defendant went in the front door of Jordan's house, using the key she had provided him. When he opened the front door, an oven rack and pots by the door made a loud noise. Defendant testified that he had never seen Jordan put the oven rack by the door before.

¶ 23　Defendant put his duffel bag down and called Jordan's name as he walked through the house. Upon reaching the bedroom, defendant started to open the door, when Jordan swung it open and started screaming at defendant. Jordan, who was naked, had a gun in her hand and tried to pull the trigger. Defendant tried to grab the gun from Jordan because he was afraid that he would get shot. As he and Jordan struggled over the gun, Black, who was also naked, came out of the bedroom and began wrestling with defendant. Defendant kicked Black in the groin and Black fell back into the bedroom.

¶ 24　Defendant testified that the gun went off "a couple of times" as he and Jordan struggled over it. Defendant denied intentionally pulling the trigger of the gun. After the gun went off, defendant heard a loud noise and he presumed that Black had fallen down. Defendant denied trying to stomp on Black while he was on the ground.

¶ 25　Defendant testified that he walked over to Black's body and saw that Black was still breathing. He told Jordan to call an ambulance but she said she was going to call the police because defendant shot him. Defendant threw the phone against the wall because he did not want Jordan to call the police. Defendant grabbed the keys to Jordan's mother's car and ran out of the house with his duffel bag and frozen pizza.

¶ 26　Defendant drove off in Jordan's mother's car with the gun in his pocket. Defendant testified that the police chased him to a forest preserve, where he jumped out of the car. Defendant ran through the woods and stepped on something that cut his foot. After spending the night in an abandoned garage, defendant went to the hospital to get his foot treated. Defendant admitted using the name "Brian Jones" at the hospital. Defendant testified that he did not immediately report the shooting to the police because he wanted to talk to a lawyer first. Defendant also testified that he fled because he was afraid that the police would not believe him.

¶ 27　Defendant initially testified that he did not accuse Jordan of cheating on him during the struggle, but admitted on cross-examination that he told the police that he accused Jordan of cheating. Defendant denied being angry and jealous when he saw Jordan in the bedroom with another man, but said that it did upset him. Defendant testified that Jordan had showed him a

picture of her wedding photograph and told him who Black was prior to November 7, 2006, but he told the police that Jordan would not tell him who the man was.

¶ 28      Defendant also called Investigator John Barloga of the Cook County sheriff's police department, who was assigned to investigate Jordan's home after the shooting. Barloga did not see any signs of forced entry into Jordan's home. In the bedroom, Barloga found a key that unlocked both the front and back doors to Jordan's home. He did not check to see if the key worked on the side door of the garage.

¶ 29      Barloga testified that his team recovered three cartridge cases from the scene: two in the hallway outside the bedroom and one in the front room. All three of the cases "were labeled .25 automatic" and each had "the same markings."

¶ 30      Barloga then went to Chicago Heights and saw a Suzuki parked at a public works garage near a wooded area. Inside the Suzuki, Barloga saw a thawed frozen pizza and black duffel bag containing men's clothing, toiletries, and pornographic movies.

¶ 31      Finally, defendant called Deputy Chief Kenneth Arvin of the Matteson police department, who testified that he interviewed Jordan at the police station at 5 a.m. on November 8, 2006. Arvin testified that Jordan told him that she placed oven racks by her door so that she would hear if defendant came into her house.

¶ 32      In rebuttal, the State called Officer Tom Pisczor of the Park Forest police department. Pisczor testified that, on August 6, 2006, he went to 247 Arrowhead Street in Park Forest, where he recovered what appeared to be a .22-caliber bullet from the siding on the back of the house. Pisczor said he packaged the bullet and sent it to the Illinois State Police crime lab. The house at 247 Arrowhead Street shared a backyard with 248 Arcadia Street. Pisczor canvassed the area, and the only person who spoke to him did not hear or see anything. The person who called the police could not say when the damage occurred.

¶ 33      Nicole Fundell of the Illinois State Police testified as an expert in firearms identification. On April 26, 2007, Fundell had prepared a report in conjunction with this case. In court, Fundell identified State's Exhibits 46A, 46B, and 46C as packages, each containing a single cartridge case. Fundell testified that the packages were sealed when she received them. Fundell had made markings on the packages. Each of the cartridge cases had head stamps–markings made by the manufacturer–that read, "WIN .25 auto." Fundell explained that this meant that these cartridge cases were Winchester, .25-caliber automatic cartridges. After examining the cartridge cases, Fundell opined that each was fired from the same gun.

¶ 34      Fundell also testified that she recognized the "identification marks" placed on State's Exhibit 5. Fundell testified that State's Exhibit 5 was an envelope, containing a sealed manila envelope that had a fired bullet inside. Fundell examined the bullet and determined that it was a .25-caliber bullet. As no other bullet had been submitted to compare that .25-caliber bullet to, Fundell searched the laboratory's "unsolved file," which contained firearms evidence collected from unsolved cases. Fundell examined a .25-caliber bullet with similar rifling characteristics to the bullet in State's Exhibit 5 and opined that they were fired from the same gun. She testified that the bullet she found in the unsolved file had been submitted by Officer Pisczor. On cross-examination, she testified that the receipt for the bullet said that it had been taken from the siding of a house.

¶ 35      Before resting in rebuttal, the State moved State's Exhibits 46A, 46B, and 46C into evidence. Defendant did not object.

¶ 36    During the jury instructions conference, defense counsel asked the court to deliver an instruction on involuntary manslaughter. Defense counsel argued that there was some evidence that defendant and Jordan had struggled over the gun that killed Black. According to defense counsel, this fact supported the reckless mental state necessary for involuntary manslaughter. The State argued that defendant's testimony did not portray any reckless acts on his part. Rather, the State contended, defendant's testimony would exonerate him of any offense if the jury believed him. The trial court denied defense counsel's request for an involuntary manslaughter instruction.

¶ 37    In his closing argument, defense counsel argued that Jordan was impeached because she said that defendant fired five shots but only three cartridge cases were recovered from the scene. In its rebuttal closing argument, the State argued that defendant was not credible and that he "had four years to think about the story he is going to tell you." Defense counsel objected to that comment and the trial court overruled the objection.

¶ 38    The jury found defendant guilty of first-degree murder, attempted first-degree murder, and armed robbery. The trial court sentenced defendant to 45 years' incarceration for first-degree murder, 30 years' incarceration for attempted first-degree murder, and 21 years' incarceration for armed robbery. With respect to the armed robbery count, the trial court stated, "[T]he [d]efendant's sentencing ranges are [6] to [30] plus, under the fact that the [d]efendant had a weapon on him. *** So the maximum would be [21] to [30]. And this [c]ourt sentences the [d]efendant to [21] years." In denying defendant's motion to reconsider sentence, the trial court clarified that it sentenced defendant to "[6], plus [15] because he did not discharge the weapon in the armed robbery." Defendant filed a timely appeal.

¶ 39                                    II. ANALYSIS

¶ 40    Defendant argues that the State failed to lay an adequate foundation for the admission of the bullet purportedly recovered from Black's body (State's Exhibit 5) or the three cartridge cases recovered from Jordan's home (State's Exhibits 46A, 46B, and 46C). Defendant also argues that his trial attorney was ineffective for failing to object to this evidence. Defendant further asserts that the State made improper remarks in closing argument, that the trial court erred in denying his request for an involuntary manslaughter instruction, and that the trial court improperly imposed a 15-year sentence enhancement to his armed robbery conviction. We address each of defendant's arguments, beginning with his challenge to the firearms evidence.

¶ 41                                A. Chain of Custody

¶ 42    Defendant contends that the trial court erred in admitting the fired bullet recovered from Black's body and the three cartridge cases recovered from Jordan's home because the State failed to lay a proper foundation for that evidence. Specifically, defendant argues that the State failed to establish an adequate chain of custody for the bullet and the cartridge cases. The State argues that defendant forfeited this issue by not objecting to the admission of the evidence at trial, and that it established a sufficient chain of custody. Defendant acknowledges his forfeiture of the issue, but contends that this error constituted plain error because the evidence at trial was closely balanced. Ill. S. Ct. R. 615(a); see *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (plain error occurs where "the evidence is so closely

balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error").

¶ 43    "The first step of plain-error review is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). We first examine whether the trial court erred in admitting the firearms evidence in this case.

¶ 44    Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 45    The party seeking to introduce an object into evidence must lay an adequate foundation in one of two ways: (1) by a witness identifying the object; or (2) by a chain of possession. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). If the object "has readily identifiable and unique characteristics, and its composition is not easily subject to change," then the proponent of the evidence lays an adequate foundation by having a witness testify that the object being admitted is the same object recovered and that it is in substantially the same condition as when it was recovered. *Id.* If, however, the object is "not readily identifiable or may be susceptible to tampering, contamination or exchange," then the proponent of the evidence must establish a chain of custody to prove that the object being admitted is the same object that was recovered. *Id.* at 467.

¶ 46    Here, the State sought to introduce evidence of a fired bullet recovered from Black's body and three cartridge cases recovered from Jordan's home. Bullets and cartridge cases are not readily identifiable or unique items. *E.g.*, *People v. Winters*, 97 Ill. App. 3d 288, 293 (1981) (wooden slug and cartridge case purportedly taken from revolver were not sufficiently unique for foundation to be laid by identification). Nothing in the record suggests that either the bullet or the cartridge cases were made unique so that a foundation could have been laid by identification alone. The State was thus required to establish a chain of custody to lay an adequate foundation for their admission.

¶ 47    To establish an adequate chain of custody, the State must show that the police took "reasonable protective measures" to ensure that the piece of evidence is the same item that the police recovered. *Woods*, 214 Ill. 2d at 467. The State does not have to present testimony from every person in the chain of custody; rather, the State must simply show "that it was unlikely that the evidence has been altered." *Id.* Once the State does so, the burden shifts to the defendant to produce evidence of "actual tampering, substitution or contamination." *Id.* Any deficiencies in the chain of custody that do not constitute "actual tampering, substitution or contamination" merely affect the weight of the evidence, not its admissibility. *Id.*

¶ 48    The Illinois Supreme Court has stressed that application of the forfeiture rule "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence" for the first time on appeal. *Id.* at 470. An error in the chain of custody will only constitute plain error "in those rare instances where a complete breakdown in the chain of custody occurs." *Id.* at 471. An example of such a "complete breakdown" is where "the inventory number or description of the recovered and tested items do not match–raising the probability that the evidence sought to be introduced at trial was not the same [evidence] recovered from defendant." *Id.*

¶ 49    We find that the State presented a sufficient chain of custody for the bullet in State's Exhibit 5. The medical examiner's report of Black's autopsy shows that she recovered "a small caliber, copper jacketed bullet" from Black's chest and submitted "the recovered bullet *** to a representative of the Cook County sheriff's police department." Officer Daniels-Davis of the Cook County sheriff's police department testified that she witnessed the autopsy and she received a sealed envelope containing the bullet from the medical examiner. Daniels-Davis then turned over the envelope to Detective White while it was still sealed. White testified that he brought the envelope back to the police station and sent the envelope to the Illinois State Police crime lab. The State's firearms identification expert, Nicole Fundell, testified that she examined the bullet and authored a report in the case on April 26, 2007. Fundell testified that she recognized the "identification marks" on State's Exhibit 5 in court. This testimony established "that it was unlikely that the evidence ha[d] been altered." *Woods*, 214 Ill. 2d at 467. In the absence of evidence of tampering, substitution, or contamination, the State's chain of custody was sufficient.

¶ 50    In reaching this conclusion, we find *People v. Echavarria*, 362 Ill. App. 3d 599 (2005), instructive. In *Echavarria*, a police officer testified that he saw his partner recover a package of suspected cocaine from the defendant's pocket. *Id.* at 602. The officer also identified one of the State's exhibits as appearing to be the same package he saw his partner recover. *Id.* The officer who actually recovered the cocaine did not testify at trial, however. *Id.* Another officer testified that the suspected cocaine recovered from the defendant weighed approximately 23 grams. *Id.* at 601. The parties stipulated that a forensic scientist would testify that he received the State's exhibit, a sealed evidence bag, from an Illinois State Police inspector. *Id.* at 602. The forensic scientist determined that the exhibit weighed 22.6 grams and contained cocaine. *Id.* The inspector who delivered the cocaine to the forensic scientist did not testify and the parties did not stipulate to his testimony. *Id.*

¶ 51    The *Echavarria* court found that this evidence "sufficiently established a reasonable probability [that] the cocaine was not tampered with or substituted." *Id.* at 607. The court recognized that there was no testimony regarding what the officer who recovered the cocaine did with it, that there was no testimony regarding how the cocaine got from the recovering officer to the State Police inspector, and that there was no testimony to explain how the cocaine came to be sealed in an evidence bag. *Id.* Still, the court concluded that the State "met the minimum standard" for proving a chain of custody. *Id.* at 607-08.

¶ 52    In this case, there was more evidence of the chain of custody of State's Exhibit 5 than what was presented in *Echavarria*. The State presented evidence of the medical examiner's recovery of the bullet from Black's body, Officer Daniels-Davis's receipt of the bullet from the medical examiner, and Detective White's receipt of the bullet from Daniels-Davis. All of these transactions occurred on the same day. White then testified that he sent the bullet to the Illinois State Police crime lab, where Nicole Fundell examined it. Fundell also identified State's Exhibit 5 in court by the "identification marks" on the package. Like *Echavarria*, the fact that the State did not present evidence of White's care and storage of the bullet before he sent it to the crime lab does not invalidate the chain of custody. We conclude, therefore, that the State's evidence established a reasonable probability that the bullet admitted into evidence was the bullet recovered from Black's body.

¶ 53    We recognize that there were substantial gaps in the chain of custody of the bullet. White did not say where he stored the bullet or when he sent it to the Illinois State Police.

Fundell did not say when she received the bullet or when she examined it. Fundell authored her report almost five months after the autopsy. Fundell recognized the "identification marks" on State's Exhibit 5, but she did not specify what those marks were or whether she made the identification marks. Despite these inadequacies, however, defendant did not object to the gaps in the chain. Had defendant objected, the State may have had an opportunity to establish a more complete chain of custody.

¶ 54 This is not a case where the evidence admitted at trial differs in amount or appearance from the evidence recovered. *Cf. People v. Gibson*, 287 Ill. App. 3d 878, 879, 882 (1997) (chain of custody inadequate where officer testified that he recovered 19 bags of cocaine weighing approximately 2 grams, but the State's chemist testified that the item under the same inventory number had 20 bags of cocaine weighing 9.3 grams); *People v. Terry*, 211 Ill. App. 3d 968, 971 (1991) (chain of custody inadequate where officer testified that he recovered 32 bags of white powder weighing approximately 8 grams, but the State's chemist testified that the item under the same inventory number had 42 bags containing a yellow substance weighing 12 grams). Nothing in the record suggests that the bullet admitted at trial was something other than the bullet recovered from Black's body. Without evidence of actual tampering, substitution, or contamination, the gaps in the chain of custody of the bullet merely affected the weight of that evidence, not its admissibility.

¶ 55 We find *People v. Slaughter*, 149 Ill. App. 3d 183 (1986), cited by defendant in support of his contention that the State failed to establish an adequate chain of custody, to be distinguishable. In *Slaughter*, the defendant was charged with possession of cannabis while serving a term of periodic imprisonment. *Id.* at 184. A correctional officer testified that he found two hand-rolled marijuana cigarettes when searching the defendant's wallet. *Id.* The officer put the two cigarettes into an envelope and put the envelope in a correctional facility safe. *Id.* at 184-85. The officer did not see the cigarettes again or take the envelope out of the safe. *Id.* at 185. The parties stipulated that an assistant State's Attorney was given a white envelope containing hand-rolled cigarettes during a hearing in defendant's case. *Id.* The State's Attorney would testify that the person who gave him the envelope said he was a correctional officer, but that the State's Attorney did not know who that person was. *Id.* The parties also stipulated that the State's Attorney gave the envelope to an investigator with his office, who turned the cigarettes over to the lab for analysis. *Id.* The analysis showed that the cigarettes contained cannabis. *Id.*

¶ 56 The *Slaughter* court found that this testimony was "wholly inadequate" to link the cigarettes taken from the defendant to the cigarettes that were later submitted to the State's Attorney. *Id.* at 186. No evidence showed who had access to the safe in which the cigarettes were contained, or who took the envelope from the safe and brought it to the State's Attorney. *Id.* at 187. The guard who recovered the cigarettes from defendant did not identify the cigarettes in court, and there was no testimony that he sealed, marked, or inventoried the cigarettes at the correctional facility. *Id.*

¶ 57 In this case, the State established a more sufficient chain of custody than in *Slaughter*. Unlike *Slaughter*, there was no evidence that unidentified individuals actually had access to the bullet taken from Black's body. Each person who possessed the bullet in this case was identified. The record does not show that anyone other than these people had custody of the bullet, and defendant did not cross-examine any of these witnesses regarding who else might have had access to the bullet. Unlike *Slaughter*, we find that the State took reasonable

protective measures with respect to the bullet admitted at defendant's trial. The trial court did not abuse its discretion in admitting State's Exhibit 5.

¶ 58 With respect to the cartridge cases in State's Exhibits 46A, 46B, and 46C, we find that any error in their admission was invited by defendant. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). Where a defendant uses evidence presented at trial as part of his case, he may not argue that the evidence was admitted in error on appeal. *E.g.*, *People v. Ramirez*, 2013 IL App (4th) 121153, ¶¶ 70, 77-78 (defendant invited error in admission of police officer's testimony describing the contents of a video where defense counsel elicited the testimony on cross-examination); *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 30 (defendant invited error in admission of gang evidence where defense counsel used the gang evidence during closing arguments). "Invited errors are not subject to plain-error review." *Sanders*, 2012 IL App (1st) 102040, ¶ 30.

¶ 59 Here, defense counsel used the three cartridge cases as evidence impeaching Jordan's testimony that defendant fired five shots. Defendant called Investigator John Barloga to testify that his team recovered three cartridge cases from Jordan's house. After Barloga testified, the State introduced Exhibits 46A, 46B, and 46C in its rebuttal case. Throughout his closing argument, defense counsel referenced the presence of the three cartridge cases in Jordan's house as impeaching her testimony. Defendant chose not to object to the admission of the cartridge cases at trial because that evidence undermined the credibility of the State's key witness. Defendant may not change course on appeal and argue that the same evidence was inadmissible in order to obtain a new trial. We decline to consider whether the admission of the cartridge cases constituted plain error.

¶ 60 We find that the State established a reasonable probability that the bullet recovered from Black's body was the bullet admitted into evidence at trial. In the absence of evidence of actual tampering, substitution, or contamination, the trial court did not abuse its discretion in admitting the bullet as evidence. We also find that defendant may not argue that the trial court erred in admitting the cartridge cases because he invited any error in their admission.

¶ 61                            B. Ineffective Assistance of Counsel

¶ 62 Defendant also contends that his trial attorney was ineffective for failing to object to the admission of the bullet and the cartridge cases because of the inadequacies in the State's chain of custody. The State contends that counsel could not be considered deficient for objecting to the chains of custody because they were sufficient. The State also contends that defendant was not prejudiced by the admission of this evidence.

¶ 63 To establish a claim of ineffective assistance of trial counsel, defendant must show that his attorney's performance was deficient and that he suffered prejudice as a result, *i.e.*, there was a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The decision whether to object to the admission of evidence is generally a strategic one that may not form the basis of a claim of ineffective assistance of counsel. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Counsel may render ineffective assistance, however, where there was no valid reason for failing to object to inadmissible evidence. *E.g.*, *People v. Sanchez*, 404 Ill. App. 3d 15, 18 (2010).

¶ 64    As stated above, the State presented sufficient evidence to establish a chain of custody for the bullet in State's Exhibit 5. Any objection to the admission of that evidence for that reason would be futile. "Defense counsel is not required to make futile motions or objections in order to provide effective assistance." *People v. Glass*, 232 Ill. App. 3d 136, 152 (1992). Nothing in the record suggests that counsel had evidence that would undermine the chain of custody for the bullet. We thus conclude that counsel was not ineffective for not objecting to the admission of State's Exhibit 5.

¶ 65    With respect to the cartridge cases in State's Exhibits 46A, 46B, and 46C, we find that defense counsel pursued a reasonable strategy in not objecting to their admission. At trial, Jordan testified that defendant fired five shots at her and Black. The State called Officer Dobrovitz, who testified that he saw three cartridge cases in Jordan's house after the shooting. Defense counsel called Inspector John Barloga, who testified that his team recovered only three cartridge cases from the scene. In his closing argument, defense counsel argued that Jordan was impeached because the physical evidence showed that only three cartridge cases were fired, not five. Counsel was reasonable in trying to impeach Jordan's testimony: she was the only eyewitness other than defendant and provided the State's most important evidence. We find that counsel's decision to use the cartridge cases in State's Exhibits 46A, 46B, and 46C as evidence supporting defendant's case cannot sustain a finding of ineffective assistance of trial counsel.

¶ 66                    C. Comment in Closing Argument

¶ 67    Defendant asserts that the State committed reversible error by arguing that "defendant had four years to think about the story he is going to tell you." The State maintains that this was a permissible argument regarding defendant's credibility and that, even if the statement was improper, defendant was not prejudiced. We agree that the isolated remark did not deprive defendant of a fair trial.

¶ 68    The parties disagree about the proper standard of review. There appears to be a conflict among Illinois Supreme Court cases regarding the correct standard for reviewing a prosecutor's remarks during argument. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), suggest that we should review this issue *de novo*. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), suggests that we should review this issue for an abuse of discretion. We need not take a position in this case, as defendant's claim fails under either standard.

¶ 69    Prosecutors have a great deal of latitude during closing argument and may comment upon and draw reasonable inferences from the evidence presented. *Hudson*, 157 Ill. 2d at 441. They must refrain from making improper prejudicial arguments or comments. *Id.* " 'It is blatantly improper to suggest that the defense is fabricated, as such accusations serve no purpose other than to prejudice the jury.' " *People v. Slabaugh*, 323 Ill. App. 3d 723, 729 (2001) (quoting *People v. Aguirre*, 291 Ill. App. 3d 1028, 1035 (1997)). However, " 'it is not improper to call the defendant a "liar" if conflicts in the evidence make such an assertion a fair inference.' " *People v. Rivera*, 262 Ill. App. 3d 16, 27 (1994) (quoting *People v. Manley*, 222 Ill. App. 3d 896, 910 (1991)).

¶ 70    Prosecutorial misconduct in closing argument warrants a new trial if the improper remarks were a material factor in the conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). In other words, we will find reversible error "only if *** the improper remarks were so

prejudicial that real justice was denied or that the verdict resulted from the error." *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 71 Defendant contends that, during the State's rebuttal closing argument, the prosecutor made an improper comment regarding the key to Jordan's house found at the scene of the shooting:

"MR. D'ANGELO [Assistant State's Attorney]: Where did this key come from?

This key didn't come from, as Counsel would like you to believe, that it came because she gave it to the defendant that day, the very day her husband is going to come over.

Let's see how crazy that is.

She has been planning with her husband, who is coming from Iowa, that he is coming for a visit, she is going to pick him up at the Greyhound Station, she is going to borrow her mother's car.

She is making all of these arrangements for his arrival and to pick him up, and remember, it is her mother's car.

Remember what she told you.

I had to get him in my mom's car, get the permission to use the car, but on the very day she is doing all that, she all of a sudden forgets that?

She is in the middle of all these plans and she blacks out, apparently, and forgets it and runs over to where the defendant lives and gives him the key and tells him, come on over the same night?

Ridiculous.

You see, the defendant had four years to think about the story he is going to tell you.

MR. TYSON [Defense Counsel]: Objection, your Honor.

MR. D'ANGELO: And he is going to have to explain–

THE COURT: Overruled. Argument.

MR. D'ANGELO:–all of the inconsistencies that are present.

So he comes with up [*sic*], oh, yeah, yeah, she called me over that day. That day."

Defendant contends that this argument was improper because it accused the defendant of recently fabricating his testimony.

¶ 72 The prosecutor's comment that "defendant to had four years to think about the story he is going to tell you" suggested that defendant had fabricated his testimony. The prosecutor made that comment in the context of proper arguments about evidence that contradicted defendant's testimony, however. See *People v. Gorosteata*, 374 Ill. App. 3d 203, 223 (2007) ("The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it." (Internal quotation marks omitted.)). Even if the prosecutor improperly implied that the defense had fabricated its case, however, we find that any impropriety did not unduly prejudice defendant's right to a fair trial.

¶ 73 Defendant cites *People v. Dunsworth*, 233 Ill. App. 3d 258 (1992), in support of his contention that the prosecutor's comment in this case deprived him of his right to a fair trial. In *Dunsworth*, the prosecutor accused defense counsel of fabricating a defense, arguing that the defense witnesses were "trained seals" who "play[ed] their parts," that defense counsel

"fed" the defendant her testimony, that the defense evidence amounted to a "[s]oap opera[ ]," and that the defense case was "all cooked up." (Internal quotation marks omitted.) *Id.* at 267-68. The prosecutor additionally accused the defense's expert witness of "mak[ing] it up as [he went] along," and being a "hired gun" rather than a "real psychologist." (Internal quotation marks omitted.) *Id.* at 268. The *Dunsworth* court found that these comments deprived the defendant of a fair trial, but also stressed that it was not assessing "each of these statements individually"; rather, it looked to the "cumulative effect of the[ ] remarks." *Id.* at 269.

¶ 74    In this case, unlike *Dunsworth*, the prosecutor only made one remark implying defense fabrication in a lengthy closing argument. See *Runge*, 234 Ill. 2d at 142 (finding that closing argument did not prejudice defendant where "[a]ll of the comments were brief and isolated in the context of lengthy closing arguments"). That comment did not approach the impropriety of the prosecutor's argument in *Dunsworth*, where the prosecutor directly accused the defense of fabricating a defense. Here, although the prosecutor implied that defendant fabricated his testimony, he did not overtly claim that the testimony was "all cooked up." The court also instructed the jury before closing arguments that "[w]hat the lawyers say is not evidence and should not be considered by you as evidence." After arguments concluded, the court instructed the jury that closing arguments do not constitute evidence and that the evidence only consisted of the testimony of witnesses and the exhibits. The court's instructions alleviated the prejudicial effect of the prosecutor's isolated comment. See *People v. Harris*, 225 Ill. 2d 1, 33 (2007) (considering the fact that "the jury was properly instructed that the arguments of counsel were not evidence" in finding that improper arguments were not prejudicial). We cannot say that the prosecutor's improper comment worked a real injustice upon defendant or was material in his conviction.

¶ 75                    D. Involuntary Manslaughter Instruction

¶ 76    Defendant next argues that the trial court erred in denying his request for a jury instruction on the lesser-included offense of involuntary manslaughter. The State contends that defendant was not entitled to an instruction on involuntary manslaughter because there was no evidence that defendant committed a reckless act. We conclude that, in light of the evidence adduced at trial, the court did not abuse its discretion in denying defendant's request for an involuntary manslaughter instruction.

¶ 77    A trial court has discretion in deciding whether to give a jury instruction. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). The court's failure to give an instruction constitutes an abuse of discretion where there is some evidence to support giving the instruction. *Id.* "Very slight evidence upon a given theory of a case will justify the giving of an instruction." *People v. Jones*, 175 Ill. 2d 126, 132 (1997). In deciding whether the evidence supports an instruction, the court does not weigh the evidence presented at trial; it simply determines whether there is some evidence supporting the instruction. *Id.* The facts and circumstances of each case determine whether an involuntary manslaughter instruction is warranted. *Jones*, 219 Ill. 2d at 31.

¶ 78    Involuntary manslaughter is a lesser-included offense of first-degree murder. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). The difference between involuntary manslaughter and first-degree murder is the mental state accompanying the act that causes the victim's death. *Id.* A defendant commits first-degree murder where he acts intentionally or he knows

that his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2006). A defendant commits involuntary manslaughter where he recklessly performs acts that are likely to cause death or great bodily harm to an individual. 720 ILCS 5/9-3(a) (West 2006). "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2006).

¶ 79    In this case, the trial court cited *People v. Castillo*, 188 Ill. 2d 536 (1999), in denying defendant's request for an involuntary manslaughter instruction. In *Castillo*, the defendant and the victim were in a fight outside a bar. *Id.* at 538-39. The State's witnesses testified that defendant fired two shots at the victim while he was standing 10 to 15 feet away. *Id.* The defendant testified that, during his fight with the victim, the victim pointed a gun at him. *Id.* at 539. The defendant took the gun away from the victim. *Id.* The victim then pulled on the defendant's arm, causing the gun to go off. *Id.* The court instructed the jury on first-degree murder and self-defense but declined defendant's request for an involuntary manslaughter instruction. *Id.* at 540.

¶ 80    The *Castillo* court held that the defendant was not entitled to an involuntary manslaughter instruction. *Id.* at 541-42. The court found that the defendant's testimony that he struggled with the victim after the victim brandished a gun was not evidence that he consciously disregarded an unjustifiable risk; rather, that testimony was "evidence that [the] defendant acted with regard to a *justifiable* risk of injuring the victim in order to protect himself." (Emphasis in original.) *Id*. at 541. The court thus found that the defendant's own testimony did not warrant an involuntary manslaughter instruction. *Id.*

¶ 81    The *Castillo* court also rejected the defendant's argument that "some evidence existed that, contrary to his own testimony, he himself produced the gun during the struggle." *Id.* The court noted that none of the State's witnesses testified that they saw the defendant draw the gun. *Id.* The court concluded, "Defendant may or may not be correct that it would have been reckless for him to draw a gun during his struggle with the victim, but, regardless, there is absolutely no evidence that he did so." *Id.* at 542.

¶ 82    In this case, like *Castillo*, defendant's testimony, if believed, supported a finding that he justifiably tried to take the gun away from Jordan. Defendant testified that Jordan emerged from her room carrying a gun, that he tried to take the gun away from her, and that Black was shot during the ensuing struggle. If believed, defendant's testimony would not have resulted in an involuntary manslaughter verdict; it would have resulted in an acquittal.

¶ 83    Defendant maintains that this case differs from *Castillo*, however, because the State presented evidence showing that he drew a gun before the struggle. Defendant argues that, unlike the witnesses in *Castillo*, Jordan testified that defendant brought a gun to her home and pointed it at Black. According to defendant, if the jury believed that he produced the gun and that Black was unintentionally shot while defendant and Jordan struggled over the gun, this evidence could support a finding that defendant acted recklessly.

¶ 84    Defendant is correct that "the pointing of a loaded weapon at another and then the discharge of that weapon after a struggle" may constitute a reckless act, "since such an act is a gross deviation from the standard of care exercised by a reasonable person." *People v. Consago*, 170 Ill. App. 3d 982, 986 (1988); see also *People v. Sibley*, 101 Ill. App. 3d 953, 956 (1981) (defendant convicted of attempted murder was entitled to an instruction on

reckless conduct where the evidence at trial showed that he pointed a gun at someone and that, during a struggle over the gun, a bystander was shot). Jordan's testimony that defendant pointed a gun at Black, taken with defendant's testimony that Black was shot as defendant and Jordan struggled over the gun, would thus support an involuntary manslaughter instruction.

¶ 85    The other evidence presented at trial, however, shows that the trial court did not abuse its discretion in denying defendant's request for an involuntary manslaughter instruction. Illinois courts consider several factors in considering whether a defendant acted recklessly: the brutality and duration of the offense, the severity of the victim's injuries, the disparity in size between the defendant and the victim, whether the defendant used a weapon, and whether the defendant struck multiple times. *DiVincenzo*, 183 Ill. 2d at 250-51. "[A]n involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly." *Id.* at 251. Here, the victim's injuries were clearly severe and defendant used a weapon in the offense. Black was shot twice: once in the chest and once in the upper arm. Jordan was also shot in the right cheek, a fact that defendant neither recognized nor explained in his testimony. The fact that three bullets managed to strike Black and Jordan belies defendant's assertion that the gun only went off while he and Jordan were struggling. Both Black and Jordan were defenseless: they were naked in Jordan's bedroom, preparing to go to sleep, when defendant, armed with a gun, burst into Jordan's bedroom and shot Black. Defendant then prevented Jordan from calling for help by trying to break her phone, stole her mother's car, and fled from the police. Defendant later used a pseudonym at the hospital and police station to conceal his identity. This evidence indicates that defendant acted intentionally or knowingly rather than recklessly. *Cf. People v. Whiters*, 146 Ill. 2d 437, 440-42 (1992) (evidence supported an involuntary manslaughter instruction where defendant stabbed her boyfriend once during a physical altercation, screamed that she did not mean to do it, and immediately called for help). In light of this evidence, we cannot say that the trial court abused its discretion in denying defendant's request for an involuntary manslaughter instruction.

¶ 86    While we recognize that a different judge may have instructed the jury regarding involuntary manslaughter, we cannot say that the trial judge's decision here was unreasonable. See *People v. Kladis*, 2011 IL 110920, ¶ 23 ("A trial court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.)). Given the strong evidence that defendant acted either intentionally or knowingly, we hold that the trial court did not abuse its discretion in refusing to instruct the jury regarding involuntary manslaughter.

¶ 87                                                    E. Sentence Enhancement

¶ 88    Defendant contends that this case should be remanded for resentencing on his armed robbery conviction because the trial court imposed a 15-year sentence enhancement that was held unconstitutional in *People v. Hauschild*, 226 Ill. 2d 63, 86-87 (2007). The State agrees that the firearm enhancement was inapplicable to defendant and that this case should be remanded for resentencing. Although we are not bound by a party's concession (*People v. Schmidt*, 405 Ill. App. 3d 474, 487-88 (2010)), we agree that the sentence enhancement does not apply to defendant.

¶ 89    At the time of the offense in this case, armed robbery carried a punishment of 6 to 30 years' incarceration. 720 ILCS 5/18-2 (West 2006); 730 ILCS 5/5-8-1(a)(3) (West 2006). If the defendant committed armed robbery while armed with a firearm, the trial court was required to add an additional 15 years to the defendant's sentence. 720 ILCS 5/18-2(b) (West 2006). In this case, the trial court sentenced defendant to 21 years' incarceration: 6 years for the offense of armed robbery and an additional 15 years based on the fact that he possessed a firearm during that offense. Whether defendant's armed robbery sentence is void is a question of law we review *de novo*. *People v. Cortez*, 2012 IL App (1st) 102184, ¶ 9.

¶ 90    The 15-year enhancement was first enacted by Public Act 91-404 (eff. Jan. 1, 2000). In *People v. Walden*, 199 Ill. 2d 392, 396-97 (2002), the Illinois Supreme Court found that statute to be unconstitutional because it violated the proportionate penalties clause under the cross-comparison approach. In *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005), however, the court abandoned the cross-comparison approach. In *Hauschild*, the court held that *Sharpe* had " 'revived' " the 15-year enhancement because it abandoned the cross-comparison approach. *Hauschild*, 226 Ill. 2d at 76-77.

¶ 91    The *Hauschild* court further held that the 15-year sentence enhancement for armed robbery committed when the defendant was armed with a firearm violated the proportionate penalties clause because the offense of armed robbery with a firearm was punished more severely than the offense of armed violence predicated upon robbery, both of which had the same elements. *Id.* at 85-88. As a result of *Hauschild*, the sentence enhancement was rendered void *ab initio*. *People v. Clemons*, 2012 IL 107821, ¶ 51.

¶ 92    In *People v. Blair*, 2013 IL 114122, ¶ 35, the Illinois Supreme Court held that Public Act 95-688 (eff. Oct. 23, 2007), revived the sentence enhancement for armed robbery. The court found that, although *Hauschild* rendered the statute void *ab initio*, that did not mean that the enhancement ceased to exist. *Blair*, 2013 IL 114122, ¶ 30. Rather, *Hauschild* simply imposed an impediment to the enforcement of the enhancement until the proportionate penalties violation was cured. *Id.* The *Blair* court found that, by amending the armed violence statute, Public Act 95-688 cured the proportionate penalties violation and revived the sentence enhancement. *Id.* ¶¶ 33-35. The court concluded that defendant, who committed armed robbery in April 2009, was properly subject to the 15-year enhancement. *Id.* ¶¶ 4, 40.

¶ 93    This court has applied *Blair* to cases, like this one, pending at the time *Blair* was decided. *People v. Fields*, 2014 IL App (1st) 110311, ¶ 49; *People v. McFadden*, 2014 IL App (1st) 102939, ¶ 34, *appeal allowed*, No. 117424 (Ill. May 28, 2014). In both *Fields* and *McFadden*, however, the defendants were convicted of armed robbery for events occurring *after* October 23, 2007, the effective date of Public Act 95-688. *Fields*, 2014 IL App (1st) 110311, ¶¶ 6-8; *McFadden*, 2014 IL App (1st) 102939, ¶ 5.

¶ 94    In this case, defendant's armed robbery conviction arose from conduct committed on November 7, 2006, before the effective date of Public Act 95-688. At the time of the offense, therefore, Public Act 95-688 had not yet cured the proportionate penalties violation that rendered the 15-year sentence enhancement void. While *Blair* held that Public Act 95-688 revived the sentence enhancement previously invalidated by *Hauschild*, it did not address the question presented in this case: whether the revived enhancement applies retroactively to offenses committed before October 23, 2007. *Blair*, 2013 IL 114122, ¶¶ 4, 40.

¶ 95    The parties agree that, in this case, the revived 15-year enhancement does not apply retroactively to defendant's sentence. "Generally, an amendment to a statute will be

construed to apply prospectively and not retroactively." *People v. Digirolamo*, 179 Ill. 2d 24, 50 (1997). Either "express statutory language or *** necessary implication" may rebut this presumption. *Id.* Statutes providing that they take effect upon becoming law "do not contain a clear expression of legislative intent that they are to be applied retroactively." *Foster Wheeler Energy Corp. v. LSP Equipment, LLC*, 346 Ill. App. 3d 753, 760 (2004).

¶ 96 An exception to the general presumption of prospective application exists "[w]here the legislature intends a retroactive application of the amendment and the statutory amendment relates to changes in procedure or remedies, and not substantive rights." *Digirolamo*, 179 Ill. 2d at 50. Procedural rules "prescribe[ ] the method of enforcing rights or obtaining redress for their invasion," such as rules regarding where service may be effected or the statute of limitations for a crime. (Internal quotation marks omitted.) *People v. Atkins*, 217 Ill. 2d 66, 72 (2005). Substantive laws "establish[ ] the rights whose invasion may be redressed through a particular procedure," such as laws that change the scope or elements of a crimes. *Atkins*, 217 Ill. 2d at 72 (quoting *Rivard v. Chicago Fire Fighters Union, Local No. 2*, 122 Ill. 2d 303, 310 (1988)). Statutes that increase the punishment for an offense affect substantive rights. See, *e.g.*, *In re F.G.*, 318 Ill. App. 3d 709, 717-18 (2000) (finding that an amendment reviving a statute previously found to be unconstitutional was substantive because it increased the punishment for an offense).

¶ 97 Nothing in Public Act 95-688 indicates that it was intended to apply retroactively. Rather, it merely provides, "This Act takes effect upon becoming law." Pub. Act 95-688, § 99 (eff. Oct. 23, 2007). Without a clear expression of intent to apply the revived sentence enhancement retroactively, we presume that the legislature intended Public Act 95-688 to have a prospective effect only. Even though *Blair* found that Public Act 95-688 simply removed the impediment to enforcing the 15-year sentence enhancement imposed by *Hauschild*, the amendment evinces no intent to remove that impediment retroactively.

¶ 98 We also find that Public Act 95-688 affects substantive law. As the *Blair* court held, the amendment revived the 15-year sentence enhancement for armed robbery. It does not alter any of the methods by which a defendant is sentenced, only the punishment for an offense. The amendment thus changes substantive law rather than procedural rules.

¶ 99 We recognize that, when *Sharpe* previously revived the 15-year enhancement, that decision applied retroactively. *Hauschild*, 226 Ill. 2d at 77-80. Public Act 95-688 does not have the same effect. While judicial pronouncements are presumed to apply retroactively, the opposite presumption applies to legislative enactments. Compare *Hauschild*, 226 Ill. 2d at 77 ("It is well established that judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to those cases pending on direct review at the time the new rule is announced.") with *Digirolamo*, 179 Ill. 2d at 50 (statutes are presumed to apply only prospectively). In *Sharpe*, the court itself revived the 15-year enhancement by eliminating the cross-comparison test. *Hauschild*, 226 Ill. 2d at 76-77. In *Blair*, by contrast, the Illinois Supreme Court held that Public Act 95-688 revived the 15-year enhancement; the court did not revive the enhancement itself. *Blair*, 2013 IL 114122, ¶ 35. Although defendant's appeal was pending at the time *Blair* was decided–meaning that *Blair* applies to his case–the statute that the *Blair* court interpreted had not taken effect until after defendant committed the offense at issue. As the statute, not *Blair* itself, revived the enhancement, we presume that statute to be prospective absent evidence of a contrary legislative intent. As stated above, we have found no indication that the legislature intended that statute to apply retroactively.

¶ 100      We accept the parties' position that the 15-year sentence enhancement does not apply to defendant. As we can resolve this issue on statutory grounds, we decline to address defendant's contention that the retroactive application of the 15-year enhancement violated the *ex post facto* clause. See *People v. Brown*, 225 Ill. 2d 188, 200 (2007) ("If a court can resolve a case on nonconstitutional grounds, it should do so. [Citation.] Constitutional issues should be reached only as a last resort."). We vacate defendant's sentence for armed robbery and remand for resentencing on that count.

¶ 101                           III. CONCLUSION

¶ 102      For the reasons stated above, we affirm defendant's convictions, vacate defendant's sentence for armed robbery, and remand for resentencing on the armed robbery count.

¶ 103      Affirmed in part and vacated in part; cause remanded.